**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **WESTLANDS WATER DISTRICT,** | **1:03-CV-05747 OWW LJO** |
| **Plaintiff,** | **MEMORANDUM AND ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT ON THE ISSUE OF INVERSE CONDEMNATION COVERAGE** |
| **v.** | |
| **ZURICH AMERICAN INSURANCE COMPANY,** | |
| **Defendant.** | |

## I.   INTRODUCTION

This is an insurance coverage dispute arising out of the 2003 court-approved settlement entered into by Westlands Water District ("Westlands") and owners of agricultural land adjacent to lands served by Westlands. *Sumner Peck Ranch, Inc., et al. v. Bureau of Reclamation*, *et al.*, 1:91-cv-0048 (the "*Sumner Peck* case"). The Plaintiffs in the *Sumner Peck* case alleged generally that their property was damaged by Westlands' failure to provide adequate drainage facilities. The *Sumner Peck* plaintiffs advanced several theories of liability, including inverse condemnation and dangerous condition of public property.

In 2003, the district court approved a settlement of the *Sumner Peck* case. The settlement obligated Westlands to pay $5 million in damages to resolve the inverse condemnation and

1

1   dangerous condition of public property claims.  In addition to
2   the $5 million settlement, approximately $4.4 million was spent
3   defending Westlands in this lawsuit, which was of extended
4   duration and complexity.

5       Throughout the relevant time period, Westlands possessed
6   various forms of liability coverage, including a primary
7   liability policy from the now-insolvent United Pacific Insurance
8   Company ("United Pacific") and an excess umbrella liability
9   policy from Defendant Zurich American Insurance Company
10  ("Zurich").  At issue in the pending motions is whether the
11  operative United Pacific policy contained an effective exclusion
12  for inverse condemnation liability and, accordingly, whether
13  Zurich should be required to "drop down" to provide primary
14  liability coverage to fill any inverse condemnation gap in the
15  United Pacific policy.

16      Before the court for decision are cross motions for summary
17  adjudication and/or summary judgment on a variety of issues.
18  Zurich asserts that the United Pacific policy does not contain an
19  exclusion for inverse condemnation liability.  In the
20  alternative, Zurich maintains that any such exclusion should be
21  deemed unenforceable.  Zurich further asserts that Westlands
22  itself has previously argued that the exclusion is ineffective
23  and that Westlands should not now be permitted to reverse its
24  position.  Finally, with respect to Westland's bad faith claim,
25  Zurich maintains that Westlands has failed to satisfy its burden
26  of proof.

27      Westlands' cross motion addresses similar, although not
28  identical issues.  First, Westlands asserts that the United

**2**

Pacific Policy does contain an enforceable exclusion for inverse condemnation liability.  In addition, assuming that the court finds an enforceable exclusion, Westlands appears to seek summary adjudication that the Zurich policy provides first-dollar coverage for the inverse condemnation settlement.

The parties submitted a stipulated statement of material facts ("SSUF"), along with a number of stipulated exhibits ("SE").  (Doc. 48.)  In addition, Zurich submitted its own statement of additional undisputed facts ("ZSUF")(Docs. 50 & 51) along with a request for judicial notice (Doc. 52).[1]  Westlands also submitted its own statement of undisputed fact ("WSUF"). (Doc. 46.)

## II.  FACTUAL BACKGROUND

### A.  Westland's Insurance Coverage.

United Pacific provided primary liability coverage to Westlands:

- From December 1, 1972 to December 1, 1973, pursuant to Policy No. 1-40-61-00.  (SSUF #10; SE F).

- From December 1, 1973 to December 1, 1976, pursuant to Policy No. LP 2-65-76-12.  (SSUF #2; SE A.)

- From December 1, 1976 to December 1, 1979, pursuant to Policy No. LP 4-83-93-99. (SSUF #3; SE B.)

---

[1] Zurich requests judicial notice of a number of court documents.  (See Doc. 52, filed Sept. 29, 2005.)  Westlands does not object.  It is appropriate to take judicial notice of such matters of public record.  Zurich's request is **GRANTED.**

3

Of critical importance are the exclusions from coverage contained within the latter two United Pacific Policies.  Specifically, the exclusions are found within a "California Public Entity Coverage Part" which replaces many of the provisions in the standard-form contract.  The exclusionary language provides in full:

> The exclusions of the policy are entirely eliminated and replaced by the following:
>
> EXCLUSIONS: THIS POLICY DOES NOT APPLY:
>
> (A)  under bodily injuries and property damage (other than automobile) to liability arising out of; (1) the maintenance and use of any aircraft owned by the named insured; (2) use of any aircraft in violation of United States Government Rules or Regulations
>
> (B)  under bodily injuries to any obligation for which the insured or any carrier as his insurer may be held liable under any Workmen's Compensation, unemployment compensation or disability benefits law, or under any similar law;
>
> (C)  under bodily injuries, except with respect to liability assumed by the insured under contract, to bodily injury or to sickness, diseases or death of any employee of the insured arising out of and in the course of his employment by the insured;
>
> (D)  under property damage, to injury to or destruction of property owned by the insured; property rented to or leased to the insured where the insured has assumed liability for damage to or destruction of such property unless the named insured would have been liable in the absence of such assumption of liability;
>
> (E)  under property damage (other than automobile) to injury to or destruction of aircraft in the care, custody or control of the insured, or to the ownership, maintenance or use of any automobile;
>
> (F)  <u>to liability arising under Article I, Section 14 of the Constitution of California;</u>

**4**

(G)   to the nuclear hazard;

(H)   to any liability because of the discharge of
      matter, including petroleum, on or into water,
      land, air, real property or personal property
      except that this exclusion shall not apply to;

      1.   Bodily Injury or Property Damage which is
           sudden and neither expected nor intended by
           the insured;

      2.   Bodily Injury or Property Damage arising out
           of the normal and usual practices of the
           insured in the application of pesticides or
           herbicides, provided that such practices are
           not in violation of any law, [ordinance] or
           of the regulations of any governmental or
           other regulatory body.

                         ***

(SE A at Bates #1152 (emphasis added).)

For the period from May 21, 1977 to December 1, 1979, Zurich
provided excess umbrella liability coverage to Westlands:

- From May 21, 1977 to May 21, 1978, pursuant to Policy
  No. 88-14-737.  (SSUF #6; SE C.)

- From May 21, 1978 to December 1, 1978, pursuant to
  Policy No. 89-26-719, (SSUF #7; SE D.)

- From December 1, 1978 to December 1, 1979, pursuant to
  Policy NO. 89-26-732, (SSUF #8; SE E.)

All three policies issued by Zurich provide excess insurance
to Policy No. LP 4-83-93-99 issued by United Pacific for the
period from December 1, 1976 through December 1, 1979.  (SSUF
#9.)

Westlands also purchased inverse condemnation liability coverage from various insurers.  Westlands obtained such coverage from Yosemite Insurance Company ("Yosemite") for the period from December 1, 1973 to December 1, 1974, pursuant to Policy No. GL 613926 (SSUF #11; SE G), and for the period December 1, 1974 to December 1, 1975, pursuant to Policy NO. GL 613981 (SSUF #12; SE H).  Sphere Insurance Company provided inverse condemnation liability coverage to Westlands for the period from May 14, 1976 to May 14, 1977.  (Policy No. SP-GP-2841; SSUF #13; SE I.)

In addition, the Association of California Agencies Joint Powers Insurance Authority ("ACWA") and Transcontinental Insurance Company ("Transcontinental") together provided Westlands with $5 million in defense and indemnity protection. ACWA and Transcontinental have spent approximately $4.4 million defending Westlands.

**B.** **Post-Settlement Events/Conduct**.

In July 1996, Westlands tendered the *Sumner Peck* litigation to United Pacific for defense and indemnity.  (ZSUF #15.)  In 1997, United Pacific denied coverage to Westlands for the claims asserted in the *Sumner Peck* litigation.  (ZSUF #16.)  In denying coverage to Westlands, United Pacific specifically acknowledged that the *Sumner Peck* litigation included inverse-condemnation claims against Westlands.  (ZSUF #17, April 2, 1997 Letter from Reliance to James P. Wiezel, ZWWD 024738-024739, attached as Exhibit 7 to the Gallanis Declaration: "The plaintiffs' liability theories against Westlands include tort, contract, and inverse

condemnation claims.*)*

Zurich points out that United Pacific has never asserted Exclusion F as a basis for denying coverage for the *Sumner Peck* litigation.  (ZSUF #19.)  For example, United Pacific's disclaimer letter did not specifically reference Exclusion F or any language that it believed to specifically exclude coverage for inverse-condemnation claims.  (ZSUF #18.)  Westlands maintains that this fact presents an incomplete picture because the disclaimer letter also stated "United Pacific/Reliance expressly reserves its right to rely on such information to accept, limit, or decline coverage for this...nor should it be construed as a waiver of United Pacific/Reliance's right to deny or accept coverage under any provisions...."[2]

Westlands first notified Zurich of the *Sumner Peck* litigation on February 29, 1996.  (ZSUF #20.)  At that time, Westlands did <u>not</u> request primary inverse-condemnation coverage from Zurich and, in fact, Westlands asserted that Exclusion F in the United Pacific policy was unenforceable.  (ZSUF #21.)

Zurich responded in writing to Westlands on August 1, 1996, by "reserv[ing] its rights and ask[ing] whether Westlands believed the Zurich policies were obligated to 'drop down' and provide primary coverage."  (ZSUF #22.)  On August 8, 1996, Westlands informed Zurich that it was an excess carrier and need

---

[2]   Westlands objects generally that "Statements made by Westlands' and United Pacific's attorneys in the 1990s about policies written in the 1970s are arguments, not evidence, and are irrelevant."  This topic is discussed below in Part IV.D.

not fulfill a primary carrier's obligations.  (ZSUF #23.)  In addition, Westlands informed Zurich that it need not attend an August 18, 1996 settlement conference between Westlands and its primary carriers.  (*Id.*)

In April 2000, Westlands sent Zurich a letter representing that the Sumner Peck plaintiffs believed Zurich had a duty to defend.  (ZSUF #24.)  Zurich, confused by this apparent turn-around, requested clarification and "asked Westlands whether any of these circumstances existed." (ZSUF #25.)  In two letter communications, dated December 27, 2000 and May 10, 2001, Westlands reaffirmed its belief that Zurich was an <u>excess</u> carrier and need not fulfill a primary carrier's obligations.  (ZSUF ##26 & 28.)

Westlands performed a comprehensive analysis of its insurance coverage, including a detailed analysis of whether its insurance policies provide coverage for inverse-condemnation claims.  Westlands sent this analysis to all its insurers on May 22, 2001.  Although Westlands acknowledged that some policies effectively exclude claims for inverse condemnation while others do not, the analysis concludes that Westlands did not believe Exclusion F in the United Pacific policy validly excludes claims for inverse condemnation.  (ZSUF ##29 & 30)  Specifically, the analysis indicated that the exclusion

> has generally been held to be ineffective because it would not inform a reasonable layman, of ordinary education and intelligence, that inverse condemnation claims were excluded from coverage. (General Insurance Co. of America v. City of Belvedere (N.D. Cal. 1984) 582 F. Supp. 88; see also Stonewall, supra, at pp. 1837-1838.)

**8**

(ZSUF #30; Westlands Response to Request for Admission No. 9.)

On October 3, 2001, the State of Pennsylvania accepted United Pacific's declaration of insolvency and ordered the company liquidated.  (SSUF #5.)  CIGA insurance then stepped into United Pacific's shoes for most purposes.  On June 24, 2003, CIGA sent a coverage denial letter to Westlands specifically citing Exclusion F as a basis for the denial.  (*See* Ex. A to the Decl. of Daniel M. Fuchs.)

After the Sumner Peck litigation settled, Westlands sought indemnification from Zurich and other insurers.  Zurich responded in a letter dated November 12, 2002, that it did not believe its excess policies were triggered.  (ZSUF #31; Sumner Decl., at Ex. 1.)  On January 22, 2003, Westlands demanded that Zurich indemnify Westlands, asserting specifically that "the inverse condemnation and tort component [of the settlement] invades Zurich's excess layer."  (Sumner Decl. at Ex. 2.)  Westlands demanded Zurich pay $4,338,713.00 for inverse-condemnation indemnity coverage and $3,338,713.00 for dangerous condition of public property indemnity coverage.  (*Id*.)

Five months later, in June 2003, Westlands filed this lawsuit against Zurich, alleging (1) that Zurich breached its insurance contract (Doc. 1 ("Compl.") ¶¶ 47-50); and (2) that Zurich breached the covenant of good faith and fair dealing arising under the California Unfair Practices Act, Cal. Ins. Code § 790 et seq. (Compl. ¶¶51-58).

**9**

Westlands recognized that it was responsible to assume the $1 million policy limit represented by the United Pacific policy with regard to liability that does not arise out of inverse condemnation.  (Compl. ¶ 44.)

To date, Westlands has received slightly more than $636,487.43 from ACWA and Transcontinental to be applied to the $5 million settlement.  (Although ACWA and Transcontinental provided Westlands with $5 million in coverage, $4.4 million of this went to defense costs, as described.)  Westlands also received $100,000.00 from Yosemite.  Westlands now seeks indemnity from Zurich in the amount of $4,363,512.57. (Compl. at ¶45; Pltf's Obj. to Zurich's Stmt. of Undisputed Fact ("ZSUF") #6.)

### III.   <u>STANDARD OF REVIEW</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, where the non-moving party has the burden of proof at trial, the moving party need only demonstrate an absence of evidence to support the claim or defense asserted by the non-moving party.  *See Id*. at 325.

**10**

Once the moving party has met its initial burden, the non-moving party must then designate specific facts showing that there is a genuine issue for trial. *Id*. at 324. "The mere existence of scintilla of evidence [is] insufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV.   **ANALYSIS**

The key question raised by the instant motions is whether the United Pacific policy language contains an effective exclusion for inverse condemnation liability. If the policy contains an effective exclusion, Zurich may be obligated to fill the gap created by this exclusion.

Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003). In this diversity case, California law provides the rule of decision.

### A.   **Rules Applicable to California Insurance Contract Interpretation**.

General principles of California contract interpretation as well as specific rules applicable to insurance exclusionary clauses are relevant in this case. As a general matter, "the mutual intention of the parties at the time the contract is formed governs [contract] interpretation." *Id.* at 647-48 (citing

**11**

Cal. Civ. Code, § 1636).  To discern the mutual intent of the parties, a court should apply the following four rules, the first three of which are to be applied in sequence.  *See generally, Croskey, et al., Cal. Prac. Guide: Insurance Litigation*, Ch. 4-A (The Rutter Group 2005).

Rule 1: The Plain Meaning.  If possible, the mutual intent of the parties is to be "inferred...solely from the written provisions of the contract."  *MacKinnon,* 31 Cal. 4th at 647 (citing Cal. Civ. Code § 1638).  If an examination of contractual language reveals a "clear and explicit" meaning, this meaning controls.  *Id.* at 647.  A court must interpret contractual language in its "ordinary and popular sense," unless terms are "used by the parties in a technical sense or a special meaning is given to them by usage."  *Id.* (citing Cal. Civ. Code § 1638; 1644).  A court must, "attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the [] language."  *Id.*

A policy provision will be considered ambiguous, and therefore without a "clear and explicit meaning," when it is "capable of two or more constructions, both of which are reasonable."  *Id.*  But, "language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract."  *Id.; Waller v. Truck Ins. Exch. Inc.*, 11 Cal. 4th 1, 19 (1995).  It is appropriate to consider extrinsic evidence for the purpose of determining whether an ambiguity exists, *Pac. Gas & Elec. Co. v.*

**12**

*G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d. 33, 37 (1968), or to show that the parties attached a special meaning to certain terms, *ACL Tech., Inc. v. Northbrook Prop. & Cas. Ins. Co.*, 17 Cal. App. 4th 1773, 1794 (1993).

Rule 2: The Insured's Objectively Reasonable Expectation. If a provision has no "clear and explicit meaning," ambiguity is "resolved by interpreting the ambiguous provisions in the sense the insurer believed the insured understood them at the time of formation." *E.M.M.I., Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 470 (2004). A court may consider extrinsic evidence to aid in the interpretation of an ambiguous provision. *Kavruck v. Blue Cross of Calif.*, 108 Cal. App. 4th 773, 782 (2003).

Rule 3: The Contra-Insurer Rule. If application of the first two rules still does not eliminate the ambiguity, "ambiguous language is construed against the party who caused the uncertainty to exist." *E.M.M.I.*, 32 Cal. 4th at 470. This third "contra-insurer rule" as applied to an insurance policy, "protects not the subjective beliefs of the insurer but, rather, the objectively reasonable expectations of the insured." *Id*. at 470-71. At this stage, "any ambiguous terms are resolved in the insured's favor, consistent with the insured's reasonable expectations." *Id*. at 471.

Rule 4: Exclusions Must Be "Conspicuous, Plain and Clear." Finally, when examining coverage limitations (e.g., exclusionary clauses), courts must apply a fourth rule as an overlay to the general rules of contract interpretation. Any provision that

**13**

limits coverage must be "conspicuous, plain and clear to be enforceable."

> [A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect. Thus, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language. The exclusionary clause must be conspicuous, plain and clear.

*MacKinnon*, 31 Cal. 4th at 648 (internal quotations and citations omitted).

Although no court has clearly articulated a comprehensive approach to applying all of these rules to resolve a dispute over the scope of an exclusionary clause, the California Supreme Court in *MacKinnon* provides important guidance. *MacKinnon* considered the meaning of language in an insurance policy that excludes from coverage injuries caused by the "discharge, dispersal, release or escape of pollutants." *Id.* at 639. Specifically, the *MacKinnon* court was asked to "determine whether that clause, a standard pollution exclusion clause, applies to exclude injury to a tenant resulting from a landlord's allegedly negligent use of pesticides on his property." *Id.* First "in order to ascertain the scope of [the] exclusion, [a court] first considers the coverage language of the policy." *Id.* at 649. The *MacKinnon* court concluded that the language at issue "establishe[d] a reasonable expectation that the insured will have coverage for ordinary acts of negligence resulting in bodily injury." *Id.*

**14**

The court next examined whether the exclusion "conspicuously, plainly and clearly apprise[d] the insured that certain acts of ordinary negligence, such as the spraying of pesticides...will not be covered." *Id.* at 649.  To do so a court "must attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the exclusionary language." *Id.*  The court consulted various sources in its search for the most reasonable interpretation of the exclusion, while taking care to avoid any interpretation that "leads to absurd results [or] ignores the familiar connotations of the words used in the exclusion." *Id.* at 653.  The critical search was for "the interpretation that the ordinary layperson would adopt." *Id.*[3]

The effect of this fourth rule on the overall approach to contract interpretation is critical.  On the one hand, if a policy dispute centered around <u>coverage</u> language (rather than exclusionary language), a court faced with several reasonable interpretations of the policy language seeks the interpretation that is most faithful to the insured's reasonable expectations and adopt that interpretation.  However, when dealing with <u>exclusionary</u> language a court must always keep in mind the rule that exclusionary language must be "conspicuous, plain, and

---

[3]   Westlands challenges the fundamental premise that exclusionary clauses should be viewed from the objective viewpoint of a layperson, suggesting instead that a more subjective approach should be applied where the buyer of insurance is sophisticated.  Westlands objection is discussed below in Part IV.C.3.a.

clear." Accordingly, when interpreting ambiguous exclusionary language the normal inquiry is modified and the proponent of a broad exclusion would only prevail if "its interpretation is the only reasonable one." *Id*. at 655. This is because unless the exclusion "plainly and clearly excludes" a certain form of otherwise covered liability, "the exclusion must be interpreted in favor of coverage." *Id*.

There are two conditions under which a court may find policy language "plainly and clearly excludes" coverage. First, under Rule One, where the plain language of the exclusion "plainly and clearly excludes" coverage. Alternatively, if a court finds the exclusionary language to be ambiguous, the exclusion may still be enforced if the proponent's "interpretation is the only reasonable one." *Id.* at 655.

### B.    The General Coverage Language in This Case.

Under *MacKinnon*, "in order to ascertain the scope of [the] exclusion, [a court] first considers the coverage language of the policy." *Id*. The pertinent language is found in the "California Public Entity Coverage Part" (an addendum to the United Pacific's standard-form contract) which replaces standard language concerning property damage liability with the following terms obligating United Pacific:

> A.    to pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of liability imposed by law, including chapter 1681 of the State of California Statutes of 1963 and amendments thereto, or liability assumed by

contract insofar as the named insured may legally
do so, for damages:
(1) because of bodily injury, sickness or disease,
including death at any time resulting therefrom
and also including care and loss of services,
sustained by any person or persons, or
(2) because of any other injury a person may
suffer to his person, reputation, character or
feelings, including but not limited to
malpractice, false arrest, detention or
imprisonment, malicious prosecution, libel,
slander, defamation of character, invasion of
privacy, wrongful eviction or wrongful entry.

B.   To pay on behalf of the insured all sums which the
insured shall become obligated to pay by reason of
liability imposed by law, including chapter 1681
of the State of California Statutes of 1963 or
liability assumed by contract, insofar as the
named insured may legally do so, for damages
because of injury to or destruction of property,
including the loss of use thereof arising out of
the ownership, maintenance or use of any
automobile.

C.   To pay on behalf of the insured all sums which the
insured shall become obligated to pay by reason of
liability imposed by law, including Chapter 1681
of the State of California Statutes of 1963, or
liability assumed by contract, insofar as the
named insured may legally do so, for damages
because of injury to or destruction of property
including the loss of use thereof.

(SSUF, Ex. B, at Bates ZWWD 000158.)   It appears to be undisputed

that, absent an effective exclusion for inverse condemnation

liability, these terms would cover Westland's liability under the

2003 *Sumner Peck* settlement.

   **C.   Analysis of United Pacific Policy Exclusion F.**

   The next inquiry is whether the terms of the exclusion

"conspicuously, plainly and clearly" apprise the insured that

liability incurred from its settlement of an inverse condemnation

action based on failure to provide adequate drainage is not covered by the policy.

The United Pacific policy at issue, Policy No. LP 4-83-93-99, effective from December 1, 1976 to December 1, 1979, provides in pertinent part:

> EXCLUSIONS: THIS POLICY DOES NOT APPLY:
> ***
> (F)   to liability arising under Article I, Section 14 of the Constitution of California;
>
> ***

(SSUF #3; SE B.)  The operative language contained in this policy (the "1976-79 United Pacific policy") is identical to that contained within an earlier version of the policy, effective from December 1, 1973 to December 1, 1976 (the "1973-76 United Pacific policy").  (Policy No. LP 2-65-76-12; SSUF #2; SE A.)

### 1.   The Re-Numbering of the Eminent Domain Provision in the California Constitution.

Prior to November 5, 1974, Article I, Section 14 of the California Constitution dealt with eminent domain:

> Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner and no right of way or lands to be used for reservoir purposes shall be appropriated to the use of any corporation, except a municipal corporation or a county or the State or metropolitan water district, municipal utility district, municipal water district, drainage, irrigation, levee, reclamation or water conservation district, or similar public corporation until full compensation therefore be first made in money or ascertained and paid into court for the owner, irrespective of any benefits from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived, as in other civil cases in a court of record, as shall be prescribed by law.

Cal. Const. art. I, § 14 (repealed Nov. 5, 1974).

On November 5, 1974, the eminent domain provision was amended and moved to Article I, Section 19, where it remains:

> Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation.

Cal. Const. art. I, § 19 (amended Nov. 5, 1974).

Also on November 5, 1974, an entirely different provision, concerning felony prosecutions, was numbered as Article I, Section 14:

> Felonies shall be prosecuted as provided by law, either by indictment or, after examination and commitment by a magistrate, by information.

> A person charged with a felony by complaint subscribed under penalty of perjury and on file in a court in the county where the felony is triable shall be taken without unnecessary delay before a magistrate of that court. The magistrate shall immediately give the defendant a copy of the complaint, inform the defendant of the defendant's right to counsel, allow the defendant a reasonable time to send for counsel, and on the defendant's request read the complaint to the defendant. On the defendant's request the magistrate shall require a peace officer to transmit within the county where the court is located a message to counsel named by defendant.

> A person unable to understand English who is charged with a crime has a right to an interpreter throughout the proceedings.

Cal. Const. art. I, § 14 (amended Nov. 5, 1974).

Zurich places great emphasis on the fact that throughout the coverage period of the 1976-1979 United Pacific Policy, the cited

passage from the California Constitution, Article I, Section 14, actually referred to the <u>felony prosecution section</u>.   Zurich maintains, therefore, that the plain meaning of Exclusion F has absolutely nothing to do with inverse condemnation.

Westlands rejoins by pointing out that the 1976-79 United Pacific Policy is simply a renewed version of the 1973-76 United Pacific Policy, which contained an identical reference to Article I, Section 14.  At the time the 1973-76 policy was issued (December 1, 1973), Article I, Section 14 still referred to eminent domain.

Westlands also asserts broadly that "courts have unanimously deemed the renumbering from Section 14 to Section 19 to be beneath notice."  (Pltf's Opp'n, Doc. 61, at 5.)   In support of this assertion, Westlands points to a large section of its motion for summary adjudication, at pages 7 to 10.  However, in these pages, Westlands only cites one case that is remotely on point: *General Ins. Co. of Am. v. City of Belvedere*, 582 F. Supp. 88 (D.C. Cal. 1984).  The district court in *Belvedere* examined an exclusion that is similar to the exclusion at issue here.  In *Belvedere*, part of a policy issued in 1978 provided:  "[t]he policy does not apply to liability arising under Article I, Section 14, of the Constitution of the State of California."  *Id.* at 89.

The insurer in Belvedere sought a ruling that an insurance policy it issued to the City of Belvedere did not cover a judgment against the City "arising out of a property damage

**20**

action involving the issue of inverse condemnation." *Id*.
Acknowledging the renumbering of the eminent domain provision,
the City of Belvedere sought to have the policy <u>reformed</u> "to
reflect what it contends to be the correct section of the State
Constitution."  The City of Belvedere then moved for summary
judgment that the exclusion "<u>as reformed</u> is ambiguous as a matter
of law." *Id*.  Under these circumstances, it is disingenuous for
Westlands to assert that the Belvedere court "deemed the
renumbering from Section 14 to Section 19 to be beneath notice."
Rather, it appears that the defendant in *Belvedere* simply
<u>conceded</u> the point prior to moving (successfully, as is discussed
below) for a ruling that the exclusion is ambiguous as a matter
of law even if it references the correct constitutional
provision.

Zurich and Westlands engage in a protracted debate over
whether Westlands should be required to seek reformation of the
policy and whether reformation is available, given the applicable
three-year statute of limitations. *See North Star Reinsurance
Corp. v. Sup. Ct.* (Sundance Fin., Inc.), 10 Cal. App. 4th 1815
(1992).  As discussed below, it is not necessary to resolve this
procedural issue, because, as the district court found in
*Belvedere*, even if the language is reformed to reflect the proper
numbering, the provision is impermissibly ambiguous and therefore
unenforceable.  The insurer argues that the new Article I,
Section 14, which refers to felony prosecution, could have
applicability to a public entity (albeit not a water district).

**21**

It is acknowledged that if intended, the exclusion, after November of 1974, should have referred to the text of Article I, Section 19.

### 2. Is the meaning of Exclusion F "clear and explicit" or ambiguous?

Assuming arguendo that Exclusion F's reference to Article I, Section 14, is intended to refer to the current text of Article I, Section 19, the first step is to determine whether a "clear and explicit" meaning can be assigned to the exclusion. A provision is ambiguous if it is "capable of two or more constructions, both of which are reasonable." *McKinnon*, 31 Cal. 4th at 648.

Article I, Section 19, provides:

> Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation.

Cal. Const. art. I, § 19.

Zurich argues that the plain meaning of the exclusion does not apply to liability for inverse condemnation because Article I, Section 19 makes no mention of the term "inverse condemnation."[4]  The reasoning of the district court in *Belvedere* regarding this omission is instructive:

_____

[4]     Similarly, the older version of the eminent domain provision (previously found at Article I, Section 14) makes no mention of the term "inverse condemnation."

**22**

1

2          [I]t is doubtful that plaintiff's purported exclusion,
           even as reformed, is sufficiently clear to meet the
3          test required under California law. Employing the
           required objective standard, it is questionable whether
4          the reasonable person of ordinary education and
           intelligence, upon being referred by his policy to
5          "Article I, Section 19" of the Constitution, would
           emerge with any conviction that what was meant was
6          inverse condemnation. Although such actions do indeed
           "arise under" that provision, neither the old Section
7          14 nor the present Section 19 makes specific reference
           to inverse condemnation. In fact, the words appear
8          neither in the Constitution nor, as plaintiff itself
           points out, in the index to the Constitution. <u>In order</u>
9          <u>to inform himself that the Section covers inverse</u>
           <u>condemnation actions, the reasonable layman would</u>
10         <u>either have to consult an attorney or familiarize</u>
           <u>himself with California appellate law. That he should</u>
11         <u>be required to so bedevil himself simply in order to</u>
           <u>comprehend the terms of his policy is surely not what</u>
12         <u>was intended by the requirement that policy exclusions</u>
           <u>be "conspicuous, plain, and clear."</u> For much the same
13         reason, plaintiff's argument that Article I, Section
           14, is "synonymous" with inverse condemnation actions
14         is unmeritorious. As to an attorney this is at best
           arguable. As to the average layman it is deeply
15         improbable.

16    *Belvedere*, 582 F. Supp. at 90 (emphasis added).

17         Westlands responds that although inverse condemnation is not

18    mentioned in Article I, Section 19 (or former Section 14), the

19    reference in Exclusion F to Section 19 is effectively a reference

20    to "inverse condemnation" because Section 19 provides the basis

21    for inverse condemnation claims under California law.   In support

22    of this contention, Westlands points to a line of cases holding

23    that California courts have consistently equated Article I,

24    Section 19 (or former section 14) with inverse condemnation

25    actions.  *See e.g.*, *Albers v. County of Los Angeles*, 62 Cal. 2d

26    250 (1965).

27

28

                                    **23**

1   Both interpretations offered by Westlands and Zurich are

2   sufficiently reasonable to justify a finding that Exclusion F is

3   ambiguous because it does not explicitly and unambiguously

4   identify inverse condemnation as an excluded risk.  The analysis

5   therefore continues.

6              **3.   Even though Exclusion F is ambiguous, does it**
               **nevertheless "plainly and clearly exclude"**
7              **coverage?**

8       As the plain meaning of Exclusion F is ambiguous, the

9   inquiry shifts to: What is the objectively reasonable expectation

10  of the insured?  In the context of an exclusionary clause

11  (subject to the general rule that exclusionary clauses are

12  interpreted narrowly) the question may be framed: Can the

13  proponent of the exclusion establish "that its interpretation is

14  the only reasonable one?"  *MacKinnon,* 31 Cal. 4th at 655.  This

15  is the only basis for an exclusion to be deemed "conspicuous,

16  plain, and clear" and therefore enforceable.  In interpreting the

17  ambiguous exclusion, a court must always search for "the

18  interpretation that the ordinary layperson would adopt."  *Id.*

19

20              ***a.   A threshold question: Should the general rule***
                ***that exclusionary clauses be construed***
21              ***narrowly apply where the insured is***
                ***sophisticated?***
22

23      Westlands challenges applicability here of the general rule

24  that exclusionary clauses should be construed narrowly, citing

25  *Garcia v. Truck Ins. Exch.*, 36 Cal. 3d 426, 438 (1984) to suggest

26  that the general rule should only be applied where the insurer

27  has far more bargaining power than the insured (i.e., where the

28

**24**

insurance policy is in effect a contract of adhesion).  *Garcia* stands for this proposition.  In *Garcia*, the California Supreme Court found that the terms of the policy had been negotiated between the carrier and the insured (a large hospital) and "the language in contention was the product of joint drafting"  *Id*. at 441.  Accordingly, the *Garcia* court concluded that it was not necessary to hold the insurer responsible for any ambiguity in the language.

Westlands suggests that the United Pacific policies fall under the *Garcia* exception.  Westlands points out that many of the key provisions of the United Pacific policy have been replaced by the "California Public Entity Coverage Part," which Westlands describes as a "manuscript endorsement."[5]  Critically, however, Westlands does not present any evidence that the terms of the California Public Entity Coverage Part were specifically negotiated between United Pacific and Westlands or that Westlands had any role in the choice of the language of the endorsement. Under similar circumstances, courts have reasoned that the *Garcia* exception is <u>inapplicable</u>.  *See Bank of the West v. Superior Court (Industrial Indem. Co.)*, 277 Cal. Rptr. 219, 227 (Cal. App. 1 1991) (*Garcia* exception did not apply where policy issued to bank was not negotiated between the parties and bank "had no hand

---

[5]     This type of policy is used in specialized risk situations or where the insured's bargaining power is "so great that the insurer agrees to negotiate the terms of the policy in order to obtain the insured's business." (Cal. Prac. Guide: Ins. Litig'n at § 3:39.)

in drafting it")(rev'd on other grounds by *Bank of the West v. Superior Court*, 2 Cal. 4th 1254 (1992)); *Keating v. Nat'l Union Fire Ins. Co.,* 754 F. Supp 1431, 1436-37 (C.D. Cal. 1990) (even though savings and loan "participated in the negotiation of the policy, and was represented by a sophisticated insurance broker,...[and] undoubtedly enjoyed significant bargaining power...the policy at issue here was not negotiated paragraph by paragraph and the policy was not the product of joint drafting....Thus, it is clear that any ambiguities in the language of the contract must be interpreted against [the insurer] as it is "the party who caused the uncertainty to exist.")(rev'd on other grounds by *Keating v. Nat'l Union Fire Ins. Co.*, 995 F.2d 154 (9th Cir. 1993)).[6]   The general rule that exclusions are construed narrowly against the insurer applies here.

### b. Is Westlands' interpretation the only reasonable one?

The next inquiry is whether the proponent of the exclusion can establish "that its interpretation is the <u>only</u> reasonable one."  Only if the answer to this question is "yes" can the exclusion be deemed "conspicuous, plain, and clear" and therefore

---

[6]   The district court in *Belvedere* rejected the City of Belvedere's argument that "as a public entity, the City of Belvedere should be held to a higher standard of knowledge or sophistication concerning interpretation of terms in insurance policies" as "unsupported by California case law."  582 F. Supp. at 89.  *Belvedere*, however, decided in February 1984, predates *Garcia*, decided in July 1984, by several months and could not address the *Garcia* exception.

enforceable. *See MacKinnon* 31 Cal. 4th at 655.  The reasoning of

the district court in *Belvedere* is a helpful starting point:

> Employing the required objective standard, it is
> questionable whether the reasonable person of ordinary
> education and intelligence, upon being referred by his
> policy to "Article I, Section 19" of the Constitution,
> would emerge with any conviction that what was meant
> was inverse condemnation. Although such actions do
> indeed "arise under" that provision, neither the old
> Section 14 nor the present Section 19 makes specific
> reference to inverse condemnation. In fact, the words
> appear neither in the Constitution nor, as plaintiff
> itself points out, in the index to the Constitution. <u>In
> order to inform himself that the Section covers inverse
> condemnation actions, the reasonable layman would
> either have to consult an attorney or familiarize
> himself with California appellate law. That he should
> be required to so bedevil himself simply in order to
> comprehend the terms of his policy is surely not what
> was intended by the requirement that policy exclusions
> be "conspicuous, plain, and clear."</u> For much the same
> reason, plaintiff's argument that Article I, Section
> 14, is "synonymous" with inverse condemnation actions
> is unmeritorious. As to an attorney this is at best
> arguable. As to the average layman it is deeply
> improbable.

*Belvedere*, 582 F. Supp. at 90 (emphasis added).  Although the

*Belvedere* court did not apply MacKinnon's interpretive

formulation, it is safe to say that the district court in

*Belvedere* would have found that Westland's reading of Exclusion F

was <u>not</u> the "only reasonable interpretation."[7]

---

[7]   One California court has cited *Belvedere* with approval,
finding it "questionable" whether an exclusion for "liability
arising under article I section 14 of the California
Constitution" was effective to exclude liability for inverse
condemnation *See Stonewall Ins. Co. v. City of Palos Verdes
Estates*, 46 Cal. App. 4th 1810, 1837-38 (1996).  That case,
however, was remanded to the trial court to take further evidence
"tending to demonstrate that [the] Section 14 of Article I
exclusion" is enforceable.

Westlands urges a departure from *Belvedere*'s reasoning in several respects.  First, Westlands argues that the Belvedere decision "did not discuss the text of Article I, Section 19." (Pltf's Mot., Doc. 45 at 12 n.6).  As Zurich points out, this is not accurate.  *Belvedere* specifically notes that "neither the old Section 14 nor the present Section 19 makes specific reference to inverse condemnation."  582 F. Supp. at 90.

Second, Westlands suggests that *Belvedere* is distinguishable because it "did not involve a manuscript public entity coverage part."  (Doc. 45 at 12 n.6.)  This is an unhelpful distinction as the public entity endorsement is obscure and its text does not use terms familiar and understandable to a layperson.  Nor is this a reason to ignore the rule of narrow construction of exclusions based on the *Garcia* case.  36 Cal. 3d 426.

Westlands next argues that Belvedere should be disregarded because it "did not discuss Government Code § 905.1."  Westlands argues that "[i]f there were any doubt that Article I, Section 19 (former section 14) refers to inverse condemnation, that doubt should be dispelled by the California Government Tort Claims Act, California Government Code section 905.1."  That provision, titled "<u>Inverse condemnation</u>; claim unnecessary to maintain action; procedure if claim filed" provides:

> No claim is required to be filed to maintain an action against a public entity for taking of, or damage to, private property pursuant to Section 19 of Article I of the California Constitution.

> However, the board shall, in accordance with the provisions of this part, process any claim which is

> filed against a public entity for the taking of, or
> damage to, private property pursuant to Section 19 of
> Article I of the California Constitution.

Cal. Gov. Code § 905.1.  Westlands argues that, in enacting this

provision, "the California Legislature recognized that Article I,

Section 19 is the source of inverse condemnation liability."

However, the subjective understanding of the California

Legislature is not relevant to the interpretation of an insurance

policy or a layperson's understanding of its language.  Rather, a

court must decide "the interpretation that the ordinary layperson

would adopt."  *Id*.[8]

Westlands advances a further argument:

> In an insurance policy, an exclusion of liability based
> on Article I, section 14 <u>only makes sense as excluding
> coverage for inverse condemnation</u>, since a public
> agency's decision to take property for public use
> through eminent domain is not insurable because it is
> an intentional act.  (Cal. Ins. Code section 533)  In
> addition, eminent domain proceedings do not meet the
> definition of "occurrence" as being "neither expected
> nor intended" by the insured. [citation]  Inverse
> condemnation, however, is insurable. [citation]
> Therefore the <u>only thing</u> that the UP Policy clause in
> question could possibly refer to is inverse
> condemnation.

_____

[8]    Westlands offers two additional unpersuasive arguments.
First, Westlands suggests broadly that *Belvedere* "conflicts with
California Supreme Court decisions discussed above," but points
to no cases that call into question either the fundamental
reasoning and principles applied in *Belvedere* or its specific
holding.
    Second, Westlands also points out the rule that another
district court case is "not binding on this Court."  This is
true, but Westlands offers no compelling basis for distinguishing
the reasoning in *Belvedere* and a district court may follow the
persuasive reasoning of another district court.

(Pltf's Mot., Doc. 45 at 9 (emphasis added and citations omitted).)   Although logically and technically persuasive, only a person with an understanding of the complex law of condemnation and inverse condemnation has the knowledge to reach this conclusion.  It is highly doubtful that "the ordinary layperson" would have such an understanding by reading Exclusion F.

Westlands has not demonstrated that its interpretation of Exclusion F is one that a reasonable layperson would adopt, nor that it is the only reasonable interpretation.  Therefore, Westlands has failed to demonstrate that Exclusion F conspicuously, plainly, and clearly excludes coverage for inverse condemnation liability.  Accordingly, Westlands' motion for summary adjudication on this issue must be **DENIED** and Zurich's must be **GRANTED.**

### D.   **Westlands' Prior Conduct**.

Zurich places great emphasis on an alternative argument that merits discussion.  Zurich argues that, prior to this lawsuit, Westlands repeatedly took the position that Exclusion F did not apply to liability based on inverse condemnation.  Westlands' conduct is argued to be an implied admission of non-coverage that should be binding.

In response to Zurich's evidence, Westlands points out that it purchased inverse condemnation coverage from other insurers for much of the time period in question.  Westlands asserts that this is consistent with its belief there was no such coverage and

1  that it would not have done so if it believed that the United

2  Pacific policies provided such coverage.

3      From the evidence presented by Zurich, throughout much of

4  the mid to late 1990s, Westlands asserted to Zurich that the

5  United Pacific policy did cover liability incurred as a result of

6  the inverse condemnation claim.  The most straightforward

7  evidence of Westlands' position is the comprehensive coverage

8  analysis Westlands sent to all its insurers on May 22, 2001,

9  which stated that Exclusion F:

10

11              has generally been held to be ineffective because it
               would nor inform a reasonable layman, of ordinary
12             education and intelligence, that inverse condemnation
               claims were excluded from coverage.  (*General Insurance*
13             *Co. of America v. City of Belvedere* (N.D. Cal. 1984)
               582 F. Supp. 88; *see also Stonewall*, *supra*, at pp.
14             1837-1838.)

15  (ZSUF #30; Westlands Response to Request for Admission No. 9.)[9]

16  This is evidence that Westlands interpreted and understood its

17  United Pacific policies to not exclude coverage for inverse

18  condemnation.

19      On January 22, 2003, Westlands demanded that Zurich

20  indemnify Westlands, asserting specifically that "the inverse

21  condemnation and tort component [of the settlement] invades

22  Zurich's excess layer."  (Sumner Decl. at Ex. 2.)  Westlands

23  _____

24          [9]   Westlands points out that after United Pacific's
    bankruptcy, CIGA insurance stepped into United Pacific's shoes
25  for most purposes.  CIGA then sent a coverage denial letter to
    Westlands, specifically citing Exclusion F as a basis for the
26  denial.  This, however, has nothing to do with Westlands' conduct
    and does not diminish the import of Westlands' communication to
27  all its insurers representing Westlands' belief that Exclusion F
    is ineffective.
28

**31**

demanded Zurich pay $4,338,713.00 for inverse-condemnation indemnity coverage and $3,338,713.00 for dangerous condition of public property indemnity coverage. (*Id.*) Five months later, in June 2003, Westlands filed this lawsuit against Zurich.

Westlands does not deny this apparent "turn-around," reversing its position, but instead argues that it is irrelevant to the current inquiry. Specifically, Westlands characterizes its representations as inadmissible parol evidence. It is clearly established California law that extrinsic evidence is admissible to aid in the interpretation of an ambiguous provision. *Pac. Gas & Elec. Co. ("PG&E"),* 69 Cal. 2d at 38, ("[T]he exclusion of relevant, extrinsic, evidence to explain the meaning of a written instrument could be justified only if it were feasible to determine the meaning the parties gave to the words from the instrument alone.").

Normally, the conduct of parties that interprets a contract during its performance is relevant to interpretation of the contract. *See Medical Operations Mgmt. Inc. v. Nat'l Health Labs., Inc.*, 176 Cal. App. 3d 886, 892 (1986). However, Westlands suggests that there are limits to the scope of California's liberal rule and insists that it is appropriate to consider evidence only from witnesses to a contract's formation. Language from *PG&E* supports Westlands' assertion. The *PG&E* court noted that admissible evidence

> includes testimony as to the circumstances surrounding
> the making of the agreement...including the object,
> nature and subject matter of the writing...so that the
> court can place itself in the same situation in which
> the parties found themselves at the time of
> contracting.

*Id.* (internal quotations omitted).  Zurich refers to a 1949 California Supreme Court case, *Barham v. Barham*, 33 Cal.2d 416, 423 (1949), which acknowledged that "a construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court."  Although this general proposition from *Barhnam* appears not to have been cited by any more recent California case, it is a bedrock principle of contract interpretation.  *Witkin, Summary of Cal. Law, Contracts*, Ch. 1 § 749 (2005).

Nevertheless, the evidence cited by Zurich is arguably not of the type contemplated by *Barnham*, consisting instead of arguments made by Westlands as part of its efforts to secure coverage from United Pacific.  Westlands' assertions about Exclusion F were made <u>after</u> a controversy arose as to the meaning of the provision.  This evidence is arguably inadmissible.[10]

The record contains prior conduct evidence that more squarely falls within the *Barnham* rule.  Westlands points out

---

[10]    It might have been more appropriate for Zurich to cite this prior conduct evidence in the context of an <u>estoppel argument</u>.  For example, there is evidence that Westlands informed Zurich that it need not attend an August 18, 1996 settlement conference "between Westlands and its primary carriers" because Westlands believed Zurich was an excess insurer.  (SSOF #23.)  However, Zurich does not raise the issue of estoppel in any of its papers, perhaps because it would have been unable to establish prejudice.

that, for part of the time period covered by the United Pacific

policies containing Exclusion F, it purchased the following

additional policies which specifically provided inverse

condemnation coverage:

- • From Yosemite Insurance Company ("Yosemite") for
        the period from December 1, 1973 to December 1,
        1974, pursuant to Policy No. GL 613926 (SSUF #11;
        SE G), and for the period December 1, 1974 to
        December 1, 1975, pursuant to Policy NO. GL 613981
        (SSUF #12; SE H).

- • From Sphere Insurance Company for the period from
        May 14, 1976 to May 14, 1977.  (Policy No. SP-GP-
        2841; SSUF #13; SE I.)

Westlands argues that it would not have purchased these policies

if it believed at the time that the United Pacific policies

provided such coverage.  Zurich points out, however, that

Westlands "offers no explanation for the six-month gap in

coverage [] (December 1, 1975 through may 14, 1976); nor does it

attempt to explain why it only purchased three years of inverse-

condemnation coverage since its inception in 1952."  (Deft's

Opp'n, Doc. 64, at 11.)  Perhaps more importantly, even if the

existence of these other policies evidences <u>Westlands' own</u>

<u>understanding</u> that Exclusion F operated to exclude coverage for

inverse condemnation, this does not necessarily indicate that

Exclusion F was "conspicuous, plain, and clear" as is required

under California law.

Westlands' evidence does not demonstrate that Exclusion F conspicuously, plainly, and clearly, excludes coverage for inverse condemnation.  Zurich's motion for summary judgment that Exclusion F does not bar coverage for inverse condemnation is **GRANTED.**  Westlands' cross-motion is **DENIED.**

As to Westlands' secondary argument that Zurich is obligated to provide first dollar coverage for the inverse condemnation settlement depends upon the operation of Exclusion F, Westlands' motion for summary adjudication on this issue is denied as **MOOT.**

**V.   CONCLUSION**

For the reasons set forth above, Zurich's motion for summary adjudication is **GRANTED** and Westland's motion for summary adjudication is **DENIED.**

**SO ORDERED.**

**Dated: February 6, 2006**

                              **/s/ OLIVER W. WANGER**

                              _____
                                   **Oliver W. Wanger**
                              **UNITED STATES DISTRICT JUDGE**